NARCISSA CREWS v. KANSAS CITY PUBLIC SERVICE COMPANY, a Corporation, Appellant.—111 S. W. (2d) 54.

Division One, December 14, 1937.*

---

*NOTE: Opinion filed at May Term, 1937, July 30, 1937; motion for rehearing filed; motion overruled at September Term, December 14, 1937.

*Charles L. Carr, Harding, Murphy & Tucker* and *Eugene E. Ball* for appellant.

*Louis R. Weiss* and *Fred M. Roberts* for respondent.

HYDE, C.—This is an action for damages for personal injuries resulting from being struck by a street car. Plaintiff had a verdict

1094

for $8,740. Defendant has appealed from the judgment entered thereon.

The case was submitted solely upon negligence under the humanitarian rule. Defendant does not assign error in the court's refusal of its peremptory instruction, but assigns error in plaintiff's main instruction authorizing a verdict, and also as to rulings concerning certain incidents occuring during the trial. We will consider first the assignment against plaintiff's Instruction No. 1. This instruction (leaving out "if so," etc.), after findings concerning the place of accident, is as follows:

"And if you further believe and find from the evidence that plaintiff approached said street car track, upon which said street car was running, and that she entered and was in a position of imminent peril, or immediately approaching a position of imminent peril by reason of the approach of said street car and was oblivious of such peril; and if you further believe and find from the evidence that defendant's motorman then and there operating said westbound street car saw, or by the exercise of ordinary care on his part, could have seen plaintiff in such position of imminent peril, or approaching a position of imminent peril and with obvious intent of proceeding across the track in front of the defendant's car, and apparently oblivious of such imminent peril in time thereafter with the means and appliances at hand, and with safety to himself, his passengers and such street car, to have either stopped said street car, sufficiently slackened its speed, or given warning to plaintiff that said street car would not stop and thereby have prevented colliding with plaintiff and injuring her, but negligently failed to do so, and that as a direct result of such negligent failure plaintiff was struck and injured by said street car, then your verdict must be in favor of plaintiff and against defendant, even though you should believe from the evidence that plaintiff failed to use ordinary care for her own safety and was careless in going upon said westbound street car track in front of said approaching street car."

The ground for defendant's assignment against this instruction as a whole is stated to be that it is "erroneous in not limiting the duty of the street car operator to the time that he saw, or by the exercise of ordinary care could have seen, plaintiff in a position of imminent peril from which she could not extricate herself." Since there is no assignment as to overruling its demurrer to the evidence, apparently defendant concedes that plaintiff made a case of humanitarian negligence on her own evidence based on helpless inextricable peril after she got into the path of the street car, or was close enough to it that she would not be able to escape injury from it solely by her own efforts. Defendant's complaint is that the position of peril is broadened by plaintiff's instruction to include a time and place when

and where plaintiff had complete ability to prevent her injury if she had continued to watch the street car and been aware of the necessity of keeping off the track, whether the motorman actually saw her or not. Defendant attacks the Missouri Humanitarian Doctrine (insofar as it places liability on the operator of a vehicle who does not actually see an oblivious person approaching the path of his vehicle) and asks that it be reexamined on fundamental principles of proximate cause.

Plaintiff was a woman sixty-one years old and weighed about 225 pounds. The place of the accident was the intersection of Flora Avenue (a north and south street) and Thirty-first Street (an east and west street) in Kansas City. The time was about six P. M., November 21, 1932. The street lights were on at the intersection. Plaintiff's evidence was that she was walking north on the west side of Flora, intending to take one of the westbound Thirty-first street cars which regularly stopped for passengers at the northeast corner of this intersection. Plaintiff saw that there was no one waiting for the car at this corner. When she was thirty or thirty-five feet south of Thirty-first Street she saw a westbound street car, with headlights burning, a block east and "walked a little brisker" until she came to the southwest corner of the intersection. A westbound street car had to come up a slight grade approaching Flora. The crest of this hill was on the east side of Flora so that a car would go downgrade while crossing the intersection. Plaintiff said: "It was coming up the street in the usual rate, I should judge about fifteen or eighteen miles per hour; . . . just like they usually run over this street. . . . And I was going on my way rapidly and I saw it begin to slow down, and it was slowing, and I was speeding up, walking good and brisk, and I was looking at it, and I got just within a step of stepping down on the Thirty-first Street curb—it was slowing so decidedly. . . . The car had slowed so decidedly slow that I began to wave my handkerchief and the motorman seemed to be looking right at me. . . . I continued to wave my handkerchief and go across the street. . . . I walked rapidly across the street, waving my handkerchief all the time. I had this hand down, and I had a white handkerchief in my right hand waving all the time." Plaintiff said she never looked at the street car after she stepped down off the curb to cross Thirty-first Street; but "I looked right at the ground, because of the indentations there in the tracks, and the tracks are raised, and I didn't want to step in those places so my feet would turn—ankles would turn— and I just picked my way carefully as I went, fearing I would fall." She further stated: "I did not see it any more until the light fell on my feet and I was then in an arm's length of it. I could throw my hand out that way, because I had my hand up, and I threw my hand down and struck the edge of the car, and I made one long leap."

Plaintiff also said that before the street car reached the intersection she saw a man in the vestibule to the left of the motorman moving around. (She thought his appearance indicated that he was about to get off.) Mr. Duffield, a witness for plaintiff, said that he was standing in the front vestibule and heard the brakes go on. He said that he glanced up and saw plaintiff six or seven feet in front of the car and "a little to the left of the headlight." He said that when the street car stopped "the front door was about even with the west sidewalk of Flora;" and that "at least one-third" of the car had passed plaintiff. In a statement offered by defendant he said "the woman said that she was trying to wave the operator down so he would stop." (There was also evidence that the man in the vestibule "had been talking with the motorman.") Other witnesses who were in the car or on the street nearby gave corroborating testimony concerning the position of the car with reference to where it stopped and how far plaintiff was from the front of the car, when found in the street after it stopped. Plaintiff also had evidence that the car had slowed down to about five miles per hour approaching Flora, but accelerated its speed to eight or nine miles per hour as it went across the intersection. Plaintiff's evidence further showed that a street car similar to the one that struck plaintiff could be stopped in about fifteen feet at eight to ten miles per hour; in ten or twelve feet at six or seven miles per hour; that these were stopping distances after the brake took effect; and that at ten miles per hour a car would travel about seven and one-half feet after the lever was thrown before the brakes took effect.

The testimony of defendant's motorman, for which there was also corroborating testimony by persons who saw the accident, was he operated the car between Wayne and Flora at about twenty miles per hour; that when he approached Flora he slowed down to about ten miles per hour for the intersection as a matter of safety; that there were no prospective passengers waiting to board car at stopping place at northeast corner of intersection; that when he first saw plaintiff "she had just left curb at southwest corner of intersection;" that she was "possibly one or two steps" from the curb, walking north; that street car was then twenty or thirty feet east of the east side of Flora and approximately fifty or sixty feet from plaintiff; that he "didn't watch her particularly;" that he saw no one else in the intersection; that as he entered intersection he glanced both to right and to left; that he looked westwardly crossing the intersection; that street car crossed intersection at about ten miles per hour; that when it reached center of Flora it had picked up a little speed over ten miles per hour; that second time plaintiff attracted his attention "she was on north rail of eastbound track" about five feet from south rail of westbound track; that

front of car was then about five or ten feet from her and car was going at least ten miles per hour; that it might have been ten or fifteen feet; that plaintiff "seemed to hesitate," looked directly at him, or at front of car, "threw her hand up and then proceeded to hurry across;" that he "wouldn't say she ran, just walked fast;" that he didn't know whether or not plaintiff waved her hand or handkerchief from the time she left the curb until she reached the north rail of eastbound track; that, when she started hurriedly toward the path of the car, he hit gong with his foot and threw emergency air completely to right to make an emergency stop with all braking power; that after he put on emergency, the car continued to go west; that it traveled about fifteen feet after he "applied the emergency;" that plaintiff continued in front of car going north; that plaintiff was struck by front of the car "just to right of headlight," was thrown to north off track; that the car went partially by her so that she was slightly east of the front door when it stopped; and that, when he went to her assistance, plaintiff said "I thought I could make you stop."

Plaintiff's Instruction No. 1 not only submitted a case on the basis "that she entered and was in a position of imminent peril;" but also submitted alternately a case of approaching the path of the street car with ability to stop if she had known it was crossing the intersection ("or *immediately approaching* a position of imminent peril by reason of the approach of said street car and was oblivious of such peril"); and directed the jury that, in either case, plaintiff was entitled to a verdict "if . . . defendant's motorman . . . saw *or by the exercise of ordinary care on his part could have seen* plaintiff . . . with obvious intent of proceeding across the track . . . and apparently oblivious of such imminent peril, in time (to act as hypothesized)." Defendant admits that this is in accord with previous decisions defining the Missouri humanitarian rule, but contends that this rule is unsound on principle and opposed to the weight of authority in this country, and urges that the long line of former decisions so holding be overruled. It will be noted that the instruction did require both a finding of obliviousness and an appearance of obviously intending to cross the track, so that the necessity of including these findings (which was the principal matter of difference in the court en banc in the recent case of Perkins v. Terminal Railroad Assn., 340 Mo. 868, 102 S. W. (2d) 915) is not involved herein. Moreover, since defendant's instructions (both F given and C refused) submitted the defendant's duty on the theory that its duty began after plaintiff was "*in* or *approaching* into a position of imminent peril," the propriety of this part of the submission is also eliminated. [See, however, State ex rel. Himmelsbach v. Becker, 337 Mo. 341, 85 S. W. (2d) 420.]

It is well settled (we think correctly beyond any doubt) that the zone of peril (whether it be called position of imminent peril or danger zone in immediately approaching a position of imminent peril, see discussion in dissenting opinion in Perkins v. Terminal Railroad Assn., 340 Mo. 868, 102 S. W. (2d) 915) is always widened beyond the immediate path of a moving vehicle by obliviousness of a person approaching its path. The American Law Institute's Restatement of Torts, section 480, would limit the rights of an oblivious plaintiff to a last clear chance case by the requirement that the defendant actually *"knew* of the plaintiff's situation" instead of extending (as we do) to cover cases in which, by the exercise of the applicable degree of care, the defendant could have known thereof. [See, also, 92 A. L. R. 47, note for collection of authorities.] In this situation, the failure of a driver to act when he *knew* that another, whose appearance indicated obliviousness, was approaching his path (either to keep from striking him or to warn him so that he could avoid his path) would clearly be the proximate cause of such person's injuries. Defendant argues for the adoption of this rule in this State.

Our humanitarian doctrine holding liable an oblivious operator, who could have seen an oblivious person approaching the path of his vehicle, was developed in the days when the only vehicle that moved at great speed were railroad trains or street cars running on a track. Then persons moving toward the track were slow moving pedestrians or comparatively slow moving horse-drawn vehicles. In such cases, it was only necessary to keep a lookout on the track and very close thereto because the zone of peril of the approaching person was always narrow. Pedestrians especially can stop in a short space and thereby save themselves from injury so that, if there was a jury case at all, it would usually be a case of imminent peril from which such person did not have time or ability to extricate himself solely by his own efforts. In other words, in such cases obliviousness could not widen the zone of peril very far. It may not work so well in the case of two equally speedy vehicles like automobiles which run anywhere in the ·street, with a wide zone of peril because of the speed of many feet (*or yards*) per second which obliviousness could widen to more than 100 feet. [See Homan v. Missouri Pacific Railroad Co., 334 Mo. 61, 64 S. W. (2d) 617.] The application of our humanitarian rule to automobiles may necessitate a lookout even for a considerable distance down side streets, so that now equal obliviousness presents a much more complicated situation. [See Ashbrook v. Willis, 100 S. W. (2d) 943, where two automobile drivers were each allowed a recovery against the other for exactly the same amount.]

Whatever may be the ultimate solution for the new strain placed

upon the fair and just operation of our humanitarian doctrine by modern fast moving motor traffic, the question raised cannot be answered here. In the first place this is an old fashioned pedestrian and street car case with a narrow zone of peril which comes within the numerous decisions of this court placing the duty to keep a lookout upon the operator of a car or train on a track, in a public street or at a public crossing, and imposing liability under our humanitarian doctrine for failure to discover an oblivious pedestrian or driver approaching the track over which he is operating. [Womack v. Missouri Pacific Railroad Co., 337 Mo. 1160, 88 S. W. (2d) 368; Willhauck v. C., R. I. & P. Railroad Co., 332 Mo. 1165, 61 S. W. (2d) 336; Homan v. Missouri Pacific Railroad Co., supra; Smith v. Kansas City Pub. Serv. Co., 328 Mo. 979, 43 S. W. (2d) 548; Alexander v. St. L.-S. F. Railroad Co., 327 Mo. 1012, 38 S. W. (2d) 1023; Bode v. Wells, 322 Mo. 386, 15 S. W. (2d) 335; Logan v. C., B. & Q. Railroad Co., 300 Mo. 611, 254 S. W. 705; Ellis v. Metropolitan Street Ry. Co., 234 Mo. 657, 138 S. W. 23.] This court has never receded from this position and instead of modifying has reaffirmed it in two recent cases en banc. [Perkins v. Terminal Railroad Assn., 340 Mo. 868, 102 S. W. (2d) 915; Schneider v. Terminal Railroad Assn., 341 Mo. 430, 107 S. W. (2d) 787; the Perkins case is being construed as further extending it, 22 Washington University Law Quarterly 581.] This case is squarely within the ruling of this court en banc (so far as obliviousness and duty of the motorman is concerned) in Bode v. Wells, supra, and is almost exactly the same case on the facts. There the plaintiff, a woman desiring to board a street car at a usual stopping place, ran to cross the track ahead of it waving an uplifted umbrella as a signal to stop for her. The platform for passengers was on the other side of the track; it was the duty of the motorman to be on the lookout there for this exact situation; but he did not do so and the car did not stop. The court held the street car company liable on the ground that approaching with such signals indicated the plaintiff's intention to cross because there was neither any reason for her to believe that she could not safely do so, nor any reasonable ground for the motorman to make any other assumption, and it was his duty to discover the plaintiff's situation. In that case the plaintiff had the right to expect that the car would stop short of her crossing place and was clearly unaware that it would not do so. In this case, plaintiff had reason to believe not only that the street car would stop but that it had stopped on the other side of the intersection. Therefore, it is a stronger case on actual obliviousness (also on appearances because plaintiff's evidence was that she held her head down) than the Bode case. In the second place, defendant adopted the same theory of submission as plaintiff so far as the motorman's duty to discover plaintiff is concerned. Defendant's Instruc-

tion F given and C refused authorized a verdict for defendant if the jury found "that after the operator of the street car in question saw, *or by the exercise of ordinary care could have seen*, plaintiff in or approaching into a position of imminent peril of being struck by said approaching street car," he did not thereafter have time to have prevented plaintiff's injury by stopping, slackening speed, or warning. The same language "or by the exercise of ordinary care could have seen" appears in defendant's instructions D, and E refused, and the same idea is conveyed in different language in L given. Defendant requested no instruction submitting any other theory or limiting its liability to actual discovery of plaintiff in peril while oblivious before she reached a position from which she would be helpless to extricate herself. It is clear that the trial court was not informed that at that time defendant's view of the principles of liability was different from plaintiff's theory. We hold that defendant thereby waived its right to complain that the trial court submitted an erroneous theory of recovery. [Grimes v. Red Line Service, 337 Mo. 743, 85 S. W. (2d) 767; Carle v. Akin (Mo.), 87 S. W. (2d) 406; Johnson v. C. & E. I. Railroad Co., 334 Mo. 22, 64 S. W. (2d) 674; Taylor v. C., C., C. & St. L. Railroad Co., 333 Mo. 650, 63 S. W. (2d) 69; Timmerman v. St. Louis Arch. Iron Co., 318 Mo. 421, 1 S. W. (2d) 791; Cole v. St. L.-S. F. Railroad Co., 332 Mo. 999, 61 S. W. (2d) 344; Sullivan v. Union Electric L. & P. Co., 331 Mo. 1065, 56 S. W. (2d) 97; Randol v. Klines, Inc., 330 Mo. 343, 49 S. W. (2d) 112; Kincaid v. Birt (Mo.), 29 S. W. (2d) 97; Meyers v. Drake, 324 Mo. 612, 24 S. W. (2d) 116; Gary v. Averill, 321 Mo. 840, 12 S. W. (2d) 747; Von Eime v. Fuchs, 320 Mo. 746, 8 S. W. (2d) 824; Phillips v. E. St. L. Railroad Co. (Mo.), 226 S. W. 863.]

■ Defendant further contends that, even though the theory of recovery submitted by this instruction be approved, the "tail" attached to it makes it prejudicially erroneous. (Authorizing a verdict for plaintiff "even though you should believe from the evidence that plaintiff failed to use ordinary care for her own safety and was careless in going upon said westbound street car track in front of said approaching street car.") In Smithers v. Barker, 341 Mo. 1017, 111 S. W. (2d) 47, we said that, "We consider it to be proper in a humanitarian negligence case to inform the jury that contributory negligence of plaintiff which only contributed to or concurred in his injury does not defeat his recovery." We there disapproved of similar language (which, however, was broader in scope and implication than used here) because in that case "the jury would have been warranted in finding that plaintiff's negligence was the sole cause of his injury," and defendant there attempted to get a submission of the issue of sole cause. It is technically correct that, if the jury found in plaintiff's favor all of the essential elements of a

humanitarian negligence case hypothesized in this instruction, plaintiff would be entitled to a verdict even though she had failed to exercise ordinary care in getting on the track in front of the street car, because, if these essentials are the facts of the case, then her negligence could only have been antecedent contributory negligence which would not be a defense. [Larey v. M., K. & T. Railroad Co., 333 Mo. 949, 64 S. W. (2d) 681, and cases cited.] However, in a case where there was a real cause issue, this statement in an instruction (not limited to contributory negligence) might be prejudicially misleading.

In this case no request was made for a submission of the sole cause issue and, of course, like any other defense or issue, it could not properly be submitted unless there was substantial evidence on which to base it. The only basis here would be the motorman's testimony that when the car was eight or ten feet from plaintiff, as she stood on the north rail of the eastbound track, she "seemed to hesitate," looked directly at him or the car, "threw up her hand," proceeded "to hurry across" not running but "just walked fast," and was struck to the right (north) of the headlight in the center of the front of the car. This would require the jury to believe the obviously impossible theory that plaintiff in the same period of time (leaving out the time she hesitated) moved practically as far as the street car (and therefore as fast) going at least ten miles per hour. [See Dunn v. C. & A. Railroad Co., 340 Mo. 1037, 104 S. W. (2d) 311.] Even allowing five feet farther for the car to move (as the motorman said the distance might have been), we do not think the evidence shows such a substantial basis for a real sole cause issue (when it would be necessary to find that a woman sixty-one years old weighing 225 pounds "just walked fast" eight or nine feet while the street car at ten miles per hour covered fifteen) that defendant could lose anything (or would be prejudiced) by not having it submitted. In support of its contention that this "tail" injects the foreign issue of plaintiff's contributory negligence and withdraws competent evidence favorable to defendant, from the jury, it cites: Mayfield v. Kansas City Southern Railroad Co., 337 Mo. 79, 85 S. W. (2d) 116, l. c. 122-123; Wholf v. K. C., Clay County & St. J. Railroad Co., 335 Mo. 520, l. c. 523-527, 73 S. W. (2d) 195, l. c. 196-199; Brown v. Wheelock (Mo.), 83 S. W. (2d) 911, l. c. 912-913; Wolfson v. Cohen (Mo.), 55 S. W. (2d) 676, l. c. 680; Freeman v. Berberich, 332 Mo. 831, l. c. 835-837, 60 S. W. (2d) 393, l. c. 394, 396; Banks v. Morris & Co., 302 Mo. 254, l. c. 266-267, 257 S. W. 482, l. c. 484-485; Pence v. K. C. Laundry Service Co., 332 Mo. 930, l. c. 941-942, 59 S. W. (2d) 633, l. c. 638; Willhauck v. Chicago, R. I. & P. Railroad Co., 332 Mo. 1165, l. c. 1168-1173, 61 S. W. (2d) 336, l. c. 337-340; Schulz v. Smercina, 318 Mo. 486, l. c. 489-491, 498-501, 1 S. W. (2d)

113, l. c. 114-115, 118-120; Silliman v. Munger Laundry Co., 329 Mo. 235, l. c. 241-242, 243-245, 44 S. W. (2d) 159, l. c. 162-163; Gray v. Columbia Terminals Co., 331 Mo. 73, l. c. 82-83, 52 S. W. (2d) 809, l. c. 813; Kleinlein v. Foskin, 321 Mo. 887, l. c. 897, 899-901, 904-905, 13 S. W. (2d) 648, l. c. 652-654-656-657; and State ex rel. Berberich v. Haid, 333 Mo. 1224, l. c. 1229-1230, 64 S. W. (2d) 667, l. c. 669. These cases are not in point on this proposition because they either hold that defendant cannot inject the issue of plaintiff's antecedent contributory negligence as a defense to plaintiff's humanitarian case, or that plaintiff cannot inject the issue of defendant's antecedent primary negligence as a basis for plaintiff's humanitarian case. There is no holding in any of them that plaintiff is not entitled to inform the jury that contributory negligence of plaintiff which only contributed to or concurred in his injury will not defeat his recovery. This whole situation has now been considerably cleared up by the decision of this court en banc in Borgstede v. Waldbauer, 337 Mo. 1205, 88 S. W. (2d) 373, and cases following it. [Doherty v. St. Louis Butter Co., 339 Mo. 996, 98 S. W. (2d) 742; Johnston v. Ramming, 340 Mo. 311, 100 S. W. (2d) 466; Dilalo v. Lynch, 340 Mo. 11, 101 S. W. (2d) 7; McGrath v. Meyers, 341 Mo. 412, 107 S. W. (2d) 792.] We hold that this concluding clause in this instruction was not prejudicial error in this case.

■ Defendant also assigns error in the trial court's refusal of defendant's request for separation and sequestration of witnesses. Concerning this the record shows the following:

"The COURT: How many witnesses have you present at this time? Mr. Weiss: Several. The COURT: Let them be sworn. Mr. Tucker: I ask for the rule, please. The COURT: It is too late. You must request the rule before the opening statements are made. (Exception.)"

Defendant contends that the rule of separation and sequestration of witnesses should be a matter of right, citing Wigmore on Evidence (2 Ed.) 909, sec. 1839. However, in most states as in this State the enforcement of this rule has been held to be a matter within the sound discretion of the trial court. [64 C. J. 118, sec. 127; 26 R. C. L. 1058, sec. 65; State v. Compton, 317 Mo. 475, 296 S. W. 137; Berberet v. Electric Park Amusement Co., 310 Mo. 655, 276 S. W. 36; see, also, Id., 319 Mo. 275, 3 S. W. (2d) 1025; State v. Sloan (Mo.), 186 S. W. 1002.] We think this is the better view because it never has been considered necessary by courts or lawyers to enforce the rule in all cases, and it might be used to unnecessarily delay and obstruct trials. Courts should not arbitrarily refuse to enforce it, but neither should litigants or lawyers be permitted to arbitrarily require it. The propriety of the exercise of discretion to refuse its enforcement must necessarily be determined in the light of the cir-

cumstances of the particular case. Defendant contends that the record shows that the court did not exercise any discretion at all but merely made an arbitrary ruling. However, the record shows that court's ruling was based upon the reason that the request was not made until after the opening statements had been made. We do not think that it can be said, even if this was the sole ground, that it was merely arbitrary, or that the adoption of such a rule of practice by the trial court would be unreasonable. It might under some circumstances be unfair, if all the witnesses of one side were present to hear the opening statements, while important witnesses of the opposite side were absent, to then exclude all witnesses from hearing the testimony. The trial court heard the opening statements, knew what had been said, and had the opportunity to know what witnesses had heard them. It was advised thereby what the conflicting issues of fact would be. These matters do not appear in the record and we therefore cannot say that the action of the trial court was arbitrary. Moreover, we do not find that there was any sharp conflicts, as to most of the material facts in this case, between the witnesses of the opposing parties and we do not find sufficient reason for holding that the court's action herein was prejudicial to defendant. This assignment is overruled.

Defendant also assigns error in the trial court's action in permitting, on cross-examination police officer Reddish (defendant's witness), the following as an improper impeachment of its motorman:

"Q. I will ask you to state whether or not the operator of the street car at the time that you went to the intersection of Thirty-first and Flora Avenue made the statement to you that this plaintiff was walking from the north to the south across Thirty-first Street. A. Yes. Mr. TUCKER: It is objected to because it is an attempt to refresh his recollection when the witness already said he didn't really —that it didn't serve to refresh his recollection and he did not remember. The COURT: You say differently now, don't you? A. No, I don't say that it refreshes my memory. I say that is what the report says that I made at that time, if it was copied right. The COURT: All right. It may be read in evidence. MR. TUCKER: Same objection. The COURT: Overruled. (Exception.)"

The officer had previously stated that he had no independent recollection of what anyone said at the scene of the accident and that reading the typewritten copy of his report did not cause him to recollect the conversation. He stated that the police procedure, as to accident reports, was, as follows:

"The COURT: Didn't you tell me a minute ago that you made that copy? A. Maybe I better explain it this way. The COURT: All right. A. At the scene of the accident I take a report of this type

and write it in long hand. It is taken to the station and the clerk makes four typewritten copies. He files my original report in one file and a copy in another file, and the others go to the Bureau of Records and different departments. My original report was filed away and there are twelve or fifteen bundles of reports missing, and mine is among them. The COURT: Was this given you at the time in the ordinary course of your work? A. Yes. The COURT: That is the way it was always handled? A. That is the way it is always handled. We make a long hand report and then they type it out and we take the typewritten sheets—and The COURT (interrupting): All right. Objection overruled. Go ahead and read it if you want to. (Exception.)''

On direct examination by defendant's counsel, the following occurred:

''Q. What did the plaintiff say about how she was injured? A. I don't remember what she said, only what my report shows. She stated she was walking across Thirty-first Street—going north across Thirty-first Street on the west side of Flora and started waving her hand for the street car to stop and the street car did not stop. . . . Q. And the intersection there, excepting those lights you mentioned, is not a brightly lighted intersection, is it? A. I marked my report as lighting poor at that intersection. Q. Why did you do that? A. Well, a report is marked 'lights good' and 'lights poor,' and I would say that the corner is not nearly as well lighted as other corners in Kansas City, and that is the reason I marked it 'poor.' ''

Since this was a minor incident in the trial and did not tend to directly contradict any material fact upon which defendant relied (all witnesses including plaintiff and the motorman said she was walking north), we cannot consider it sufficient ground for reversal. It seems reasonable to believe that the officer meant that, after the typewritten copies were made from his original handwritten report, he had read and approved them because he also said: ''That is accurate. I have read it.'' Moreover, since defendant elicited from the officer statements which were contained in this report, it is not in a position to complain concerning this statement, also contained in it, brought out on cross-examination.

Defendant further assigns error in the closing argument of plaintiff's counsel. The matters and incidents concerning which objections were made and rulings thereon were as follows:

''Mr. WEISS: Now, gentlemen, you need not waste any sympathy over Mr. Tucker. He has got other cases. Mr. TUCKER: I object to that as improper argument, if the court please. The COURT: Sustained. Mr. WEISS: You gentlemen will hardly have gone into your jury room when this brilliant disciple of Blackstone will have returned to his office calling for another file to go into another lawsuit,

and properly so—Mr. TUCKER (interrupting): I object to that line of argument, if the court please, and ask that the jury be instructed to disregard it. The COURT: I think, Mr. TUCKER, the last remark was not improper. I think it was complimentary. (Exception.) Mr. WEISS: Now, gentlemen, you need not waste any sympathy on the street car company. My client is a human being and had human bones to break. Mr. TUCKER: If the court please, that is an appeal to passion and prejudice, and I object to it for that reason. Mr. WEISS: It is true. Mr. TUCKER: It is prejudicial and I object to it. The COURT: Overruled. (Exception.) Mr. WEISS: She had human bones to break and she loves life and she has been permanently crippled for the rest of her days. Not so with Mr. Tucker's clients. They can go out and make some more money, but this plaintiff is forever prevented from making money. Mr. TUCKER: I renew my objection and move for the discharge of the jury because of the prejudicial argument of counsel. The COURT: Overruled. (Exception.)'' Plaintiff's counsel also made the statement that ''hospitals are filled with people because the person in charge of the instrumentality which came in collision with them says he did not see them.'' Objection was made and overruled and an exception taken to this ruling also.

Most of this argument concerns the damages, to which counsel was contending plaintiff would be entitled. The amount of the verdict was not excessive for the permanent injury shown (broken hip) to a woman who supported herself by her own work, and no claim is made by defendant that the verdict was excessive. The question of liability turned upon the ability of the motorman to stop after he saw or could have seen plaintiff in imminent peril, and, while the statement about hospitals is rather exaggerated, plaintiff's counsel had the right to argue both that the motorman did see and should have seen her. While we do not approve of all of these statements and find some of them close to the border line, we do not feel justified in holding them to be prejudicial as a matter of law. Plaintiff's counsel claims they were retaliatory to the argument of defendant's counsel, which is not preserved in the record. The trial court is allowed considerable discretion in permitting and restraining arguments which will not be interfered with unless clearly abused. The whole matter of prejudicial argument was before the trial court, and the judge was in a position to know all that was said, how it was said, and all the surrounding circumstances of the trial. We are inclined to accept his ruling on the motion for new trial in view of what we find in this record. [See Rouchene v. Gamble Construction Co., 338 Mo. 123, 89 S. W. (2d) 58; Marlow v. Nafziger Baking Co., 333 Mo. 790, 63 S. W. (2d) 115; Goyette v. St. L.-S. F. Railroad Co. (Mo.), 37 S. W. (2d) 552; Irons v. American Ry. Express Co., 318 Mo. 318,

300 S. W. 283; McCarty v. St. Louis Transit Co., 192 Mo. 396, 91 S. W. 132.]

The judgment is affirmed. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.